Argued January 6, reversed and remanded February 9, 1966

# SECRETARY OF STATE *v.* HANOVER INSURANCE COMPANY
### 411 P. 2d 89

*Peter S. Herman,* Assistant Attorney General, Salem, argued the cause for appellant. With him on the briefs was Robert Y. Thornton, Attorney General, Salem.

*Asa L. Lewelling,* Salem, argued the cause and filed a brief for respondent.

Before McALLISTER, Chief Justice, and PERRY, GOODWIN, HOLMAN and SCHWAB, Justices.

GOODWIN, J.

The state brought five causes of action upon a fidelity bond and appeals from an adverse judgment entered upon a directed verdict.

The issue upon trial was whether certain officers, admittedly covered by the defendant's bond, had caused the state "a loss of money * * * through any failure of official duty * * *," which was the condition of the bond.

While the state, as plaintiff, has the ultimate burden of proving that it lost money through the failure of its bonded officers to perform their duties properly (to account), it may, by putting on a *prima facie* case, require the defendant bonding company to go forward with evidence to overcome or contradict the state's

case. The question now before us is whether the evidence which the state offered makes out a *prima facie* case. If it does, it was error to direct a verdict.

The bonded officers, all in the Oregon Military Department, were the Adjutant General, the Assistant Adjutant, and the Fiscal Officer. The substance of all five causes of action is that one or more of these officers improperly authorized expenditures of public money. Since the complaint does not charge the officers themselves with fraud or intentional misconduct, the state is proceeding on the theory that the officers must have been deceived by a subordinate.

The Fiscal Officer drew checks which were cashed against the Oregon National Guard Revolving Fund as follows:

| Year | Payee | Amount |
|------|-------|--------|
| 1957 | Mess Officer | $ 825.00 |
| 1958 | Mess Officer | 195.00 |
| 1958 | Commissary Officer | 907.50 |
| 1959 | Commissary Officer | 198.76 |
| 1959 | Commissary Officer | 539.95 |

Each of these checks was in payment of a claim submitted by the designated payee for "rations." There was proof that $136.35 had been spent for rations. The remainder of the proceeds of the checks was accounted for only by the statements of the "mess officer" or the "commissary officer" who cashed them. The person making the so-called voucher in each case was answerable to one or more of the bonded officers for the performance of his duties. If a subordinate's written statement that he spent for "rations" a state check payable to himself is an adequate accounting of public funds, then the state has proved no breach of duty in this case. If such an accounting is inadequate,

however, the state has made a *prima facie* case and is entitled to have the responsible officers explain why they paid the various amounts of cash to their subordinates as indicated by the check register. The canceled checks were not in evidence, but were described as "missing from the files."

The subordinates who received the cash were not bonded but were, presumably, subject either to military discipline or to criminal liability, or both, if their claims were false. Each held a National Guard commission, and each was also a civilian employe of the Oregon Military Department. The evidence is not clear with reference to the capacity in which each subordinate was acting when he submitted the claims, but in either his military or his civilian capacity he was directly responsible to one or more of the bonded officers.

While the state produced evidence, by way of impeachment, which tended to show that one or more of the claims for "rations" may have been false, it was not necessary to the state's case that the state establish the falsity of any claim or fraud on the part of the subordinate making the claim. It was necessary only that the state establish that the public's money had been spent and that the accounting offered in support thereof by a bonded officer failed to show that the money had been spent for a lawful purpose.

If the commissary officers followed proper accounting procedures, they could lawfully buy or sell certain foodstuffs for cash. A proper accounting, the state contends, would necessarily show who received rations sold for cash and to whom the money was paid, or, in the case of rations purchased for cash, who sold them. In some circumstances a commissary officer could sell to certain civilians food from federal

stocks. In a sale of federal property, however, the purchaser normally would make any check for such purchase payable to the Treasurer of the United States, and not to a "commissary officer." The state proved that the funds involved in this case were not spent for federal rations, because it showed that there were no checks payable to the Treasurer of the United States, and no receipts from the Treasurer for cash.

The other possible use of the money in a lawful manner was likewise not documented by any supporting vouchers. If the subordinates in fact used the cash proceeds of the checks to pay civilian merchants for foodstuffs or beverages, such acts might have been authorized. There is, however, no evidence that any such transactions were consummated. If such transactions are relied upon, proper accounting practices would require that the original invoices and receipts showing such cash purchases on the market be filed.

Neither the mess officer nor the commissary officer could account for more than $136.35. With that exception, their records did not show that the cash paid to them had been expended for any purpose, legitimate or otherwise. They simply filed claims for "rations." When asked from whom he bought the rations, a subordinate officer testified that he did not remember.

There were likewise no records to show that federal rations had been sold for cash from supplies under the control of the subordinate officers or that the cash in question had been turned over to the Treasurer of the United States. A witness who had a very poor memory for specific transactions testified that in similar cases he sometimes presented claims for rations and then cashed the checks and turned the cash over to one of the bonded officers. Original documents of

account would have rendered unnecessary reliance upon such a memory.

Assuming that the bonded officers were innocent of wrong and acted in good faith when they authorized the payment of cash to their mess officer and their commissary officer, the adequacy of their accounting depends entirely upon the sufficiency of the subordinates' claims as "verified vouchers." Such vouchers are required by the statutes under which the bonded officers obtained their authority to spend money. ORS 397.440 (2).

A voucher, this court has held, "is a document which shows that the services have been performed or expenses incurred. It covers any acquittance or receipt discharging the person or evidencing payment by him. When used in * * * connection with [the] disbursement of moneys, it implies some instrument that shows on what account or by what authority a particular payment has been made, or that services have been performed which entitle the party to whom it is issued to payment * * *." *Camp & DuPuy v. Lauterman,* 78 Or 134, 138, 152 P 288 (1915).

■ A voucher that does not designate from whom the rations were purchased or carry with it the receipts for the moneys expended is no voucher. It is nothing but the subordinate's own unsworn statement that the money claimed was spent, or would be spent, for rations. Such a voucher clearly tends to prove nothing, and fails to comply with the requirements of ORS 397.440 (2).

■ The defendant objects that in rejecting these vouchers as conclusive, we are shifting the burden of proof and adopting a rule of strict liability. Such a rule is said to be unduly harsh because it requires the

appointing officer to be a guarantor of the integrity of his subordinates. Insofar as the ultimate burden of proof is concerned, it remains in this case upon the plaintiff. The burden of going forward with evidence, however, properly shifts to the defendant when the state has established that the purported accounting is insufficient to show who received the money and for what purpose.

■ We need not decide whether, in a negligence case, it would be negligence to pay out public funds upon vouchers such as those relied upon in this case. This is not a negligence case. A strict standard of care is applicable to custodians of public money. *Fleischner et al. v. Florey et al.,* 111 Or 35, 224 P 831 (1924).

There is nothing harsh about such a rule. The choice is one of sound public policy. The books are full of cases of presumably innocent sheriffs held liable for the wrongs of their deputies, and of conscientious county clerks held liable for the defaults of their deputy clerks. See, e.g., *State ex rel O'Connell v. Engen,* 60 Wash2d 52, 371 P2d 638 (1962) (an innocent city clerk whose deputy stole money). The protection of the public treasure underlies the statutory scheme requiring certain public officers to be bonded. If bonding companies could escape liability merely by showing that a bonded officer's subordinate was careless or corrupt, the public would be well advised to save the money it pays out on premiums for such bonds.

> "Not only our statute but public policy demands that such public official [a county clerk] should be responsible for all public moneys received by him irrespective of whether or not he is negligent. The rule of strict accountability is the only rule which will safeguard the welfare of the public. Any derogation of such rule would not be safe. There is some conflict of authority upon the question. We

think the overwhelming weight of authority as well as the better reason support the rule herein announced * * *." *Fleischner et al. v. Florey et al.,* 111 Or at 41.

Oregon has never departed from this standard, and should not do so now. For cases elsewhere, see 67 CJS 411, Officers § 119 (1950). (The *Fleischner* case was a much more excusable failure to account than the one now before us. In the *Fleischner* case a bank failed.)

■ The rule of strict liability is burdensome, but not unduly so. A bonded officer knows when he delegates to a subordinate the power to deal with public money that he is giving his appointee the power to ruin him by corrupt practices. We need not decide today what defenses might be available to a bonded officer when he is sued in a hypothetical case, but at the very least he has a duty to make a full disclosure and accounting. It is better that the bonded officer, rather than the public, bear the burden of scrutinizing the vouchers of subordinates and explaining those that need explanation.

To accept a subordinate's transparently self-serving voucher in full exoneration of a superior would place before a bonded officer grave temptations. If there were collusion and corruption, the public would have no remedy.

■ A court cannot direct a verdict against the state in a case of this kind simply on the basis of the defendant's contention that the vouchers appeared to be true. For the purposes of the directed verdict, the state proved its *prima facie* case when it proved that the bonded officers had control of the funds, that they authorized the disbursement of the funds in the form of cash, and that the vouchers did not show to whom

or for what purpose the cash was paid out by the subordinate who obtained the purported rations.

Upon another trial, the defendant is at liberty to show, if it can, that each expenditure of funds was in fact for a legitimate purpose and was within the scope of the statutory authority.

The law requires that the officers having the control of the public's money and of the records pertaining to its expenditure make the accounting. The defendant's theory would leave the taxpayers to search for the evidence while the accountable officers look on as spectators. The state should not be put to a search for a needle in a haystack that is controlled by the bonded officers. If, when all the evidence is in, the defendant cannot show that the money was in fact expended for an authorized purpose, then the officers charged with the duty of accounting will have failed of their duty. This is exactly the kind of failure the bonding company insured against.

A number of the state's assignments of error deal with questions of evidence. A large amount of relevant evidence was excluded. The questions, for the most part, concern the application of the more common exceptions to the hearsay rule and need not be discussed. The exhibits that were not inadmissible hearsay should have been received. The state urges, however, that it was also entitled to have the jury consider an audit report prepared by the Secretary of State which, it is alleged, contains some admissions by certain persons that properly should have been admitted as admissions against interest. For the purposes of receiving such evidence, we assume that a surety stands in the shoes of the principal insofar as declarations at the time of a questioned transaction are concerned. The fact that

there may be, however, in a large volume of patent hearsay, some scattered evidence that is admissible has never been suggested by this court as a proper ground for receiving in evidence the entire exhibit. The state is free to extract and offer whatever evidence, if any, may be admissible, and the trial court may properly exclude that hearsay which does not come within a recognized exception to the hearsay rule.

Reversed and remanded.